UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


FLORIDA FAMILY ASSOCIATION,
INC., et. al.,

       Plaintiffs,

v.                         CASE No. 8:05-CV-2045-T-24TGW

SCHOOL BOARD OF
HILLSBOROUGH COUNTY,

       Defendant.

_____


REPORT AND RECOMMENDATION

      The plaintiffs in this case have sued the defendant alleging

claims of deprivation of their First Amendment rights based upon the

blocking of some e-mails they sent to the defendant regarding amendments

to the 2006-07 school calendar for Hillsborough County.  Both parties have

filed motions for summary judgment on the plaintiffs' second amended

complaint.  To the extent that the plaintiffs contend that a School Board

member in conjunction with School Board employees blocked their e-mails

based upon content (and that appeared to be the plaintiffs' original

contention), the claims fail because the evidence establishes that the blocking was not due to content and because the plaintiffs did not show that the action was taken pursuant to a policy adopted by the School Board. With respect to the plaintiffs' belated challenge that the School Board adopted a facially unconstitutional policy of prohibiting "unwanted" or "unsolicited" e-mails, the plaintiffs lack standing to assert that challenge. Moreover, the challenge is unpersuasive because that policy only governs e-mails from within the school system, and because it merely permits the end users to decide what e-mails should be blocked.   Therefore, I recommend that the defendant's motion for summary judgment (Doc. 70) be granted, and that the plaintiffs' motion for summary judgment (Doc. 80) be denied.

## I.

The plaintiffs in this case are the Florida Family Association, Inc. ("FFA"), and David Caton.   FFA is a non-profit organization whose stated purpose is to educate citizens on promoting biblical values and education in their communities (Caton Dep., pp. 6-7).  Caton is the president and executive director of FFA, which is run out of Caton's home (id. at p.

4).  The organization presently has no employees, and has supporters but not members.  The sole defendant is the School Board of Hillsborough County.

In the Fall of 2005, the School Board voted to remove certain religious holidays from the 2006-07 school calendar.  Caton, through the FFA, organized an e-mail campaign to be sent to the School Board, seeking to have the vote reconsidered (Doc. 80, p. 2). According to Caton, prior to sending out his e-mail action alert, he tested nine e-mail addresses to confirm that the addresses were correct by sending three or four e-mails to the nine addresses initially through his Verizon account (Doc. 25, p. 3; ¶¶ 7, 9; Caton Dep., pp. 105-06).  On November 2, 2005, at about 4:20 or 4:25 p.m., FFA sent an e-mail action alert to approximately 8,500 of its supporters regarding the calendar issue (Caton Dep., pp. 49, 58, 75, 83). The e-mail recipient could then click on a link and, if he or she did so, was brought to FFA's website where the e-mail reader could either choose to "click here for more information" or choose to "take action" (Doc. 25, pp. 2-3, ¶7; Doc. 25-2, pp. 2-3; Caton Dep., p. 50).  Upon clicking the "take action" option, the person was then taken to another website in which Rally Software was utilized (Doc. 25, p. 3, ¶7; Caton Dep., p. 50).

Rally Software, which is provided by the American Family Association, is used in mass e-mail campaigns in that supporters who go to the website can send e-mails to the intended recipients with a message that has already been prepared for the user (Doc. 25, p. 3, ¶¶ 7, 8; Caton Dep., pp. 51-52).  Thus, according to the second amended complaint, Rallysoft e-mail can only be sent if (1) the user enters a text on the e-mail's subject line, (2) the user supplies a return address, (3) the user supplies a password (given to registered FFA supporters), and (4) the e-mail message does not contain any attachments (Doc. 25, p. 3, ¶8).

In this case, the e-mails were sent through an IP address, which was indiachildren.org (Caton Dep., p. 54), to the seven School Board members, the superintendent of schools and the general district e-mail address (Doc. 25, p. 3, ¶7; Doc. 80, p. 3).  The suggested prepared message stated (Doc. 25-2, p. 3; Doc. 80, p. 3):

> Please reconsider your vote regarding the removal of Yom Kippur, Good Friday and the day after Easter from the school calendar.
>
> These spiritual holidays have been a part of America's heritage and history for over two hundreds [sic] of years.  They are deeply rooted in the religious traditions of this country.

> Please do not erase America's religious traditions
> from the school calendar.

After the FFA's e-mail action alert was disseminated, FFA's supporters began e-mailing the School Board members, the superintendent and the general district e-mail, requesting the School Board to reconsider its vote regarding the school calendar.

Ann Candy Olson, the School Board chairperson, was at home when she began receiving the e-mails, which were coming in every few seconds[1] (Olson Dep., pp. 19, 26-27, 28, 88). Olson thought that, due to the volume and regularity of the e-mails she was receiving, it may be some type of an attack on the system, like a worm or virus (id. at pp. 26-27, 29). Sometime after 4:00 p.m. that day, Olson called her assistant, Diane Renee McBryar, asking her to see if anyone in the computer department was available to look into the issue (McBryar Dep., p. 17; Olson Dep., pp. 26-27).

---

[1]Olson has a laptop at home and also a Blackberry on which she can check her e-mails (Olson Dep., pp. 19, 20).

McBryar called Pauline Romano, the assistant manager of internal communications (e-mail system administration), and informed her of the situation (McBryar Dep., p. 20).  Romano was on her way home and told McBryar to call John Graber, a systems and procedures analyst for the school district (Graber Dep., p. 3; McBryar Dep., p. 24; Romano Dep., pp. 48, 56).  McBryar then called Graber about the matter and informed him that a lot of e-mails were being received by the School Board members (Graber Dep., p. 13; McBryar Dep., p. 25).  Graber asked McBryar to forward him some of the e-mail messages so that he could investigate the situation (Graber Dep., p. 13).

McBryar sent Graber three or four e-mail messages (id. at p. 15).  According to Graber, upon receiving the e-mails, he looked at the e-mails' internet header  and discovered that the e-mails were coming from the same IP address and had the domain name of indiachildren.org (id. at pp. 13, 22). Graber was suspicious of the e-mails because they were from the same IP address and were coming in at a rapid rate that could indicate an automated process (id. at  pp. 13, 24, 54).

Graber then went to discuss the matter with his boss, Richard Laneau Jr., the data center manager (id. at pp. 62-63; Laneau Dep., p. 5). The discussion only lasted between five to ten minutes (Graber Dep., p. 62; Laneau Dep., p. 23). It was late in the afternoon, around 4:30 p.m., and Laneau at that time was in the office of Jack Davis, who is the chief information and technology officer and Laneau's and Graber's boss (Laneau Dep., pp. 23, 28). Graber informed Laneau that people were complaining that they were receiving multiple e-mails (id. at p. 13). Laneau asked Graber to monitor the e-mail traffic.

Graber returned shortly and stated that the e-mails were all coming from the same IP address (id.). Graber also said that the e-mails were coming from the domain indiachildren.org (id.). Laneau, who was ready to leave the office at the end of his workday, told Graber to block the IP address (id. at p. 24). Davis, whose workday was also ending, concurred with the decision (Davis Dep., pp. 37, 156).

At around 5:30 or 6:00 p.m., Caton began receiving e-mails from FFA's supporters that their e-mails were being bounced (Caton Dep., pp. 89). In other words, their e-mails were not being received by the School

Board because the e-mails were blocked.  Caton approximates that between sixty and seventy e-mails successfully went through and were received by the School Board (id. at p. 92).  There were 108 e-mails that were blocked (Davis Dep., Ex. 18, p. 2).

After learning of the block, Caton sent another e-mail to the School Board to determine if it was possible to send his message through his own personal e-mail account (Caton Dep., pp. 66, 67).  When that e-mail was received, Caton informed his supporters, probably around 7:00 p.m., through another e-mail action alert that the supporters could copy the attached message and send it through their own e-mail accounts (id. at pp. 64, 66, 93).  Some supporters did then send the message through their own personal e-mail accounts to the School Board (see id. at p. 67; Olson Dep. p., 82; Exs. 28, 30).

In the meantime, School Board member Jennifer Faliero, who was on Caton's side on the school calendar issue, had asked a question about the volume of the e-mails being received (Faliero Dep., p. 21).  Caton contacted her and told her that e-mails were being blocked (id. at p. 9).  She

then sent a message around 9:30 p.m. asking why e-mails were being blocked (id. at p. 11).

Davis was thereafter informed that the blocked e-mails concerned the school calendar issue.  As a result, he called Laneau between 7:00 and 7:30 the next morning and told him to unblock the e-mails as soon as possible (Laneau Dep., pp. 45-46).

Graber, who is normally responsible for removing blocks, was not in the office at 8:30 a.m.  Therefore, Laneau attempted to remove the IP address from the list of blocked addresses (Davis Dep., p. 144; Graber Dep., p. 121; Laneau Dep., pp. 46-47).  However, Laneau was unaware that he needed to take an additional step in the removal of the block, so that the IP address utilized by the FFA remained blocked (Graber Dep., p. 122; Laneau Dep., p. 47).

The next morning, November 4, Laneau learned from the newspaper that the block had not been removed and discussed the matter with Davis (Laneau Dep., p. 48).  Davis then called Caton in an effort to determine the problem (Davis Dep., p. 146; Laneau Dep., p. 48).  After Caton sent a sample e-mail, which was blocked, Graber looked into the

matter and concluded that Laneau had not finished the final step in unblocking the IP address (Graber Dep., p. 122; Laneau Dep., pp. 47-48). Graber, therefore, corrected the mistake and completed the final step in removing the block (Graber Dep., p. 124; Laneau Dep., p. 49).

That same day, Caton and FFA filed this lawsuit against the School Board (Doc. 1). Thereafter, the plaintiffs filed a second amended complaint (Doc. 25). Count I of that complaint alleges that the defendant's blocking of the plaintiffs' e-mails violated their right to free speech under the First and Fourteenth Amendments (id. at p. 6, ¶¶ 20, 21). Specifically, the plaintiffs claim that the block "was a willful and impermissible restraint on [the] [p]laintiffs' political speech protected by the First Amendment to the United States [C]onstitution in violation of 42 U.S.C. § 1983" (id. at ¶21). Under Count II, the plaintiffs assert that their rights to petition the government under the First and Fourteenth Amendments were violated (id. at p. 7, ¶¶ 24, 25). The plaintiffs also seek a declaratory judgment pursuant to 28 U.S.C. 2201 that the defendant's electronic mail servers and electronic mail communications system constitute a public forum (id. at ¶27). Finally, the plaintiffs request temporary and permanent injunctive relief enjoining

the defendant from blocking the plaintiffs' e-mails that contain political speech (id. at p. 8).

Subsequently, both parties filed motions for summary judgment (Docs. 70, 80).   The motions were referred to me for a report and recommendation (Doc. 91).   After both parties responded to the motions (Docs. 94, 97), a hearing was conducted (Doc. 105).

Both parties raise various arguments in their summary judgment motions and in their respective responses.   The plaintiffs in their motion for summary judgment argue that the School Board's e-mail system constitutes a public forum and that, therefore, their First Amendment rights to free speech were violated when their e-mails containing political speech were blocked and not sent to the intended recipients (Doc. 80, pp. 12-18). Thus, the plaintiffs assert that the School Board created a designated public forum when it invited the public to contact the School Board members via e-mail (id. at pp. 15-16).

The plaintiffs also now argue that the School Board's policy concerning e-mail is unconstitutional on its face because it gives the School Board's staff members unfettered discretion in blocking "unwanted e-mails"

(id. at pp. 18-20).   In particular, the plaintiffs take issue with Telecommunications Guideline 8.33, which states (Davis Dep., Ex. 23, §8.33):

> Harassment or unsafe, unwanted, or unsolicited contact via district sponsored telecommunications services and networks is prohibited in accordance with board policy.  Users cannot be completely prevented from accessing services or information that may be offensive or inappropriate; therefore, individual users must be responsible for their own conduct in using telecommunications services and networks.

In this connection, the plaintiffs assert that the policy places improper content-based restrictions on blocking e-mails and that the policy is so overbroad that it cannot possibly be narrowly tailored to serve any state interest (Doc. 80, pp. 20-22).   Therefore, summary judgment should be granted in their favor because their political speech e-mails were blocked in violation of the First Amendment based upon an overbroad and facially unconstitutional policy.

The defendant counters the plaintiffs' assertions in its response memorandum and in its own motion for summary judgment.  The defendant contends that the crux of the plaintiffs' case now is that the School Board

has a facially unconstitutional policy in force regarding the blocking of e-mails (Doc. 94, pp. 11-12).  The defendant contends that this is a new argument that was not properly pled in the plaintiffs' complaint and, therefore, should not be considered at the summary judgment stage (id.).

The defendant also argues in its motion for summary judgment that the plaintiffs lack standing (Doc. 70, pp. 24-25).  In support of its argument, the defendant asserts that FFA does not have organizational standing because it does not have members that are part of its organization and instead only has supporters (id. at p. 24).  In addition, the defendant contends that Caton cannot establish individual standing based on a right to have his message sent repeatedly to the intended recipients (id. at pp. 24-25).  However, at the hearing, the defendant stated that, with respect to the plaintiffs' new argument, a claim of a facial First Amendment violation is sufficient to satisfy the standing requirement.

The defendant further asserts that the plaintiffs have failed to demonstrate that they are entitled to recover in a §1983 action based upon a violation of their First Amendment rights (Doc. 94, pp. 7-8; 12-14).  Thus, the defendant contends that the plaintiffs have not proven that the School

Board has a policy or custom to block e-mails based on viewpoint (Doc. 70, pp. 13-14).

In addition, while the defendant acknowledges that the plaintiffs' e-mails contained political speech, it contends that the e-mails were not blocked based on their content. It argues further that the School Board's e-mail system is not a public forum (id. at pp. 16-22; Doc. 94, pp. 16-17).

Following the hearing, the parties on April 5, 2007, were given the opportunity to submit memoranda concerning whether the plaintiffs' facial challenge can be pursued at this stage of the case (Doc. 106). Both sides have done so (Docs. 107, 108).

After the motions had been under consideration for more than four weeks, the plaintiffs on May 4, 2007, submitted a motion to file a third amended complaint (Doc. 111). The thrust of that motion was to amend the complaint to allege a claim based upon the "unwanted" or "unsolicited" provision (Doc. 111-2). That motion was also referred to me for a report and recommendation (Doc. 112).

II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56©). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the [opposing] party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

When the party moving for summary judgment has the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact by presenting credible evidence that would entitle it to a directed verdict if the evidence was not controverted at trial. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991). If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437-38. If the movant  meets its initial burden, then it is entitled to summary judgment unless the opposing party comes forward with

"significant probative evidence demonstrating the existence of a triable issue of fact."  Id. at 1438.

When the party moving for summary judgment does not have the burden of proof at trial, that party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the opposing party's case at trial, or, alternatively, it may come forward with "affirmative evidence demonstrating that the [opposing] party will be unable to prove its case at trial."  Id.  If this burden is not met, then the motion for summary judgment will be denied.  Id.

When the moving party meets its initial burden, the burden then shifts "to the [opposing] party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences

therefrom in the light most favorable to the opposing party.  <u>Reynolds</u> v.

<u>Bridge-stone/Firestone, Inc.</u>, <u>supra</u>, 989 F.2d at 469.  Any reasonable doubts

about the facts are to be resolved in favor of the party opposing the motion for

summary judgment.  <u>Id</u>.

III.

The plaintiffs have been proceeding, or so it seemed, upon the

theory that their e-mails were blocked because of the message they contained,

or because of School Board member Olson's prior encounters with Caton.

The plaintiffs are now arguing that they are making a facial constitutional

challenge to the School Board's policy to prohibit "unwanted" or

"unsolicited" e-mails.  It is unclear whether the plaintiffs have abandoned

their original theory.  If they have not, they might as well have, since it is

meritless.

At the outset, it is appropriate to address the disagreement

between the parties concerning the nature of the forum arising from the

School Board's receipt of e-mails.  The plaintiffs argue that the School

Board's statement on its web site welcoming e-mails created a type of public

forum (Doc. 80, pp. 14-18), while the School Board contends that it did not

(Doc. 94, pp. 16-17).  An e-mail system presents its own unique problems, such as viruses and spam, and the Fifth Circuit has referred to the issue of public versus private forum status of e-mail servers as "dicey."  White Buffalo Ventures, LLC v. University of Texas at Austin, 420 F.3d 366, 374 n.15 (5th Cir. 2005), cert. denied, __ U.S. __, 126 S.Ct. 1039 (2006).  That issue need not be resolved here, however, since the motions are properly decided in favor of the School Board even under an assumption that the e-mail system creates some type of a public forum.

        The plaintiffs' original theory fails because, for one thing, the plaintiffs have sued only the School Board.  The School Board, as a branch of local government, cannot be held liable on a theory of respondeat superior. Denno v. School Board of Volusia County, Florida, 218 F.3d 1267, 1276 n.9 (11th Cir. 2000), cert. denied, 531 U.S. 958 (2000); see also,  Davis v. DeKalb County School District, 233 F.3d 1367, 1375 (11th Cir. 2000), cert. denied, 532 U.S. 1066 (2001).  Rather, for the School Board as a government entity to be responsible under §1983, it must have a policy or custom that caused the plaintiffs' injury.  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997); Monell v. Department of

Social Services of the City of New York, 436 U.S. 658, 694 (1978); McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004); Grech v. Clayton County, Georgia, 335 F.3d 1326, 1329 (11th Cir. 2003).  A policy is an officially promulgated policy.  Grech v. Clayton County, Georgia, supra.  A custom is "'a practice that is so settled and permanent that it takes on the force of law.'" McDowell v. Brown, supra, 392 F.3d at 1290 (internal citations omitted).  Therefore, "it is generally necessary to show a persistent and wide-spread practice." Id.  Normally, isolated incidents do not create liability, id., although a single incident can establish a policy.  Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

Moreover, actions by an individual can create municipal liability only if the individual has final policy-making authority.  Pembaur v. City of Cincinnati, supra, 475 U.S. at 482-83; Denno v. School Board of Volusia County, Florida, supra, 218 F.3d at 1276.  An official acquires final policy making authority through legislative enactment, although an official with such authority may delegate the authority to another individual to make policy.  Pembaur v. City of Cincinnati, supra, 475 U.S. at 483; Church v. City of Huntsville, 30 F.3d 1332, 1342-43 (11th Cir. 1994).  Furthermore, whether an

official has final policy making authority is a question of state law. Pembaur v. City of Cincinnati, supra, 475 U.S. at 483.  These principles ensure that a government entity is liable only for those deprivations resulting from decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the entity.  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, supra, 520 U.S. at 403-04.

In other words, a "plaintiff must ... demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, supra, 520 U.S. at 404 (emphasis in original).  Consequently, simple or even heightened negligence is not sufficient to establish liability.  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, supra, 520 U.S. at 407.

The School Board is authorized under Article IX, §4(a) of the Florida Constitution, which states:

> Each county shall constitute a school district; provided, two or more contiguous counties, upon vote of the electors of each county pursuant to law, may be combined into one school district.  In

> each school district there shall be a school board
> composed of five or more members chosen by
> vote of the electors in a nonpartisan election for
> appropriately staggered terms of four years, as
> provided by law.

An individual School Board member does not have authority to act alone, since Florida law provides that "[t]he district school board, acting as a board, shall exercise all powers and perform" various duties in the establishment and the operation of the schools.  Fla. Stat., §1101.42; see also Church v. City of Huntsville, supra, 30 F.3d at 1343 (statements and actions by single council member did not establish a city's liability where final policy making authority rested with the five member council and mayor and there was no evidence that the single council member was delegated such authority); Mason v. Village of El Portal, 240 F.3d 1337, 1340 (11th Cir. 2001) (all three council members of a three member majority of a five member council had to share in the illegal motive to create municipal liability).

These principles clearly defeat the plaintiffs' original claim that Olson triggered a content-based blocking of the plaintiffs' e-mails.  Even if that assertion were true, it would not result in liability of the School

Board.  Olson, on her own, could not create a School Board policy. Importantly, the plaintiffs, with respect to this claim, have not identified any School Board policy that authorized the blocking of e-mails.  Moreover, School Board member Faliero testified that there was no such policy (Faliero Dep., pp. 11-12).

Furthermore, the plaintiffs have made no attempt to show that there was some custom or practice regarding the blocking of e-mails that was approved, either explicitly or implicitly, by the School Board.  Indeed, in their post-hearing memorandum, the plaintiffs disavow any reliance upon a custom or practice.  Thus, they acknowledge that the School Board is only liable if the alleged violation results from (1) an official government policy, (2) the action of an official fairly deemed to represent government policy, or (3) a custom or practice so pervasive and well-settled it assumes the force of law  (Doc. 108, p. 4).  The plaintiffs state that they are only proceeding on the first basis, that is, an officially enacted policy (id.).

In short, there was neither a policy nor a custom or practice that supports a claim against the School Board for the blocking of the e-mails.

In addition, the evidence does not sustain the plaintiffs' allegation that the decision to block the e-mails was content-based. The three men involved in the quick end-of-the-day decision to block the e-mails, Davis, Laneau and Graber, each testified that content did not play any role in the decision.  Rather, they blocked the e-mails because the e-mails were coming in at a rapid rate from the same IP address, so that there was a concern it could fill up the employees' mailboxes and interfere with their ability to get their work done (Davis Dep., p. 85; Graber Dep., pp. 30-33).  Accordingly, Laneau, the data center manager who gave the order to block the e-mails, testified that the content of the e-mails was irrelevant to his decision (Laneau Dep., p. 23).  Similarly, Graber, who was Laneau's subordinate and who carried out this order, stated that he would not have blocked something based on a message because that would not be his role (Graber Dep., p. 17).

Davis, who was Laneau's and Graber's boss, said that he was an educator and deferred to the views of his technical staff, but that he concurred in the decision (Davis Dep., pp. 34, 37, 156, 225).  Davis testified that the decision was not content related (id. at p. 227).  He explained that

the intention was to stop the e-mails from overflowing employee mailboxes at the end of the day when they were going home (id. at p. 85).

Not only did these three participants in the decision state unequivocally that content did not play a role in the decision to block the e-mails, but there was testimony that, when Davis learned of the content of the e-mails, he ordered the next morning that the block of the IP address be lifted (Laneau Dep., pp. 45-46).  Thus, Laneau stated that, as he was driving to work between 7:00 and 7:30 the morning after the e-mails had been blocked, Davis called him on his cell phone and told him that the e-mails concerned the calendar agenda item and to unblock the address as soon as possible (id.).  This fact strongly confirms that the decision to block the e-mails was not based on content.

The plaintiffs have not come forward with any significant probative evidence to controvert the testimony of these three men.  Rather, they have put forth nothing but suspicion and speculation.  Consequently, there is no basis upon which a reasonable fact-finder could conclude that each of these three men was lying when he said that the decision to block the e-mails was not based on content.  See Scott v. Harris, __ U.S. __, 127

S.Ct. 1769, ___ [page citation not currently available] (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

For these reasons, the plaintiffs' original claim that the employees blocked the plaintiffs' e-mails based on content would not support relief from the School Board.[2]

In light of the patent lack of merit in the plaintiffs' original claim, it is understandable that they would seek another theory.  The plaintiffs now claim that the School Board has adopted a policy regarding e-mails that is unconstitutional on its face.  Specifically, they challenge the

---

[2]The defendant also raised substantial challenges to the plaintiffs' standing regarding this claim.  I seriously question Caton's standing since he does not appear to have suffered an injury in fact.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Thus, not only did he successfully transmit at least one e-mail through indiachildren.org  before the block, but he quickly learned he could send e-mails from his own e-mail account.  Moreover, I doubt that he would suffer an injury in fact from the elimination of certain holidays from the school calendar because there is no indication that he or a family member was employed by the school system, or that he had a child in the school system.  Cf. Elk Grove Unified School District v. Newdow, 542 U.S. 1 (2004).

Standing on this claim cannot be resolved at this stage, however, because the facts are not sufficiently developed to permit a confident conclusion whether FFA can maintain associational standing.  See American Legal Foundation v. F.C.C., 808 F.2d 84, 89-91 (D.C. Cir. 1987).

guideline that states: "Harassment or unsafe, unwanted, or unsolicited contact via district sponsored telecommunications services and networks is prohibited in accordance with board policy" (Davis Dep., Ex. 23, §8.33).

The defendant objects to the belated raising of this claim, asserting that it was not pled (Doc. 94, p. 2; Doc. 107). Having conducted hearings in this case, I, like the defendant, was surprised to see the new theory. Consequently, at this late stage, a refusal to consider the new claim would not be unwarranted.

However, while the theory was not articulated in the second amended complaint, it arguably might be read into that general notice pleading. More significantly, the plaintiffs' wide-ranging depositions of the School Board members and employees contain adequate information to consider, and reject, the new claim. Thus, while the defendant's objection has merit, I determined to evaluate the new claim.

Consequently, for several weeks, the preparation of this document occupied the bulk of my time. And then, when I was on the verge of filing it, the plaintiffs finally decided that maybe they needed to

amend their complaint to allege their new theory.  For several reasons, that request should be denied.

In the first place, the plaintiffs' supporting argument starts with the principle in Rule 15(a), F.R.Civ.P., that leave to amend "shall be freely given" (Doc. 111, p. 4).   That, however, is not the proper starting place under the circumstances of this case.

The court in its Case Management and Scheduling Order of May 4, 2006, provided that "[m]otions to amend any pleading ... are distinctly disfavored after entry of " that Order (Doc. 18, p. 2).  The entry of such an Order requires consideration of Rule 16(b), F.R.Civ.P.  In <u>Sosa</u> v. <u>Airprint Systems, Inc.</u>, 133 F.3d 1417 (11th Cir. 1998), the Eleventh Circuit held that, when a district court enters a Rule 16 Scheduling Order, which, among other things, limits the time to amend the pleadings, that order may be modified only "upon a showing of good cause" pursuant to Rule 16(b).  The court explained that a plaintiff must show good cause under Rule 16(b) before it is appropriate to consider whether an amendment is proper under Rule 15(a).  <u>Sosa</u> v. <u>Airprint Systems, Inc.</u>, <u>supra</u>, 133 F.3d at 1419.

Moreover, the admonition contained in the Case Management and Scheduling Order was raised by the defendant (although <u>Sosa</u> was not cited) when the plaintiffs sought leave to file the second amended complaint (Doc. 23).  In permitting the filing of that complaint, the court noted that, while motions to amend after the entry of the Scheduling Order are disfavored, this case was then "still in the early stages" (Doc. 24, p. 4).  However, the court expressly "warn[ed] Plaintiffs that no further amendments to the complaint will be allowed" (<u>id</u>. at pp. 4-5).  The plaintiffs had no reason to think that that was an idle warning.

Conceivably, the court might be willing to disregard the warning upon a showing of good cause.  The plaintiffs, however, do not even mention good cause, much less demonstrate it.

Significantly, the defendant raised on January 29, 2007, in its response to the plaintiffs' summary judgment motion the plaintiffs' failure to allege their new theory.  Moreover, that deficiency was addressed at the hearing on April 4, 2007, and was the focus of the Order for post-hearing memoranda entered the next day.  There is no justification for the plaintiffs to delay until May 4, 2007, at 5:55 p.m., the filing of a motion to amend.

In all events, even if the plaintiffs' motion were judged simply under Rule 15(a), the motion should be denied. Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Justice does not require granting leave to amend, however, where the amendment would prejudice the defendant or follows undue delay. Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999). Furthermore, the Eleventh Circuit stated in Campbell that "[p]rejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided." Id.; see also Jameson v. Arrow Company, 75 F.3d 1528, 1534-35 (11th Cir. 1996). That is essentially the situation here. While the motions have not been finally decided, I had not only reached my decision, but I had written my analysis in a document that had progressed to the eve of filing.

Moreover, having reached my decision, I am prepared to say that the filing of the third amended complaint would be futile. A court, of course, need not permit an amendment where, among other things, the amendment would be futile. Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001). In this case, I proceeded forward on the (questionable) assumption that the

second amended complaint alleged a facial constitutional challenge to the "unwanted" or "unsolicited" provision. For the reasons about to be discussed, that challenge fails. Accordingly, an amendment to allege such a challenge would be futile.

In addition, I think that, alternatively, the motion to amend should be stricken because it contains a significant misstatement of the evidence. <u>See</u> Rule 11(b)(3), F.R.Civ.P. The motion represents that "[i]n the end [of the discovery depositions] the School Board employees stated that they had blocked the e[-]mails pursuant to an officially enacted School Board policy giving them unfettered discretion to determine what e[-]mail is 'unwanted'" (Doc. 111, p. 3). This statement is false. I have read all the depositions of the School Board employees (and members) and no one said any such thing. As previously indicated, Davis, Laneau and Graber each stated that content had nothing to do with the blocking of the e-mails. Further, as explained in more detail later, the e-mails in this case were not blocked pursuant to the "unwanted" or "unsolicited" provision, but due to a different provision. Since the plaintiffs could not reasonably assert otherwise, the motion to amend should, in the alternative, be stricken.

Although I recommend that the motion to amend be denied or stricken, I had already evaluated the plaintiffs' facial challenge to the "unwanted" or "unsolicited" provision.  Further, I have now modified this document to include comments regarding standing based upon the proposed third amended complaint.

Unlike the defendant's position with respect to the original content-based claim, it does not assert a standing argument to the facial challenge.  This is despite the fact that the provision the plaintiffs are challenging is not the provision Davis relied upon in his memorandum to the School Board explaining the blocking of the e-mails.  Thus, the provision regarding "unwanted" or "unsolicited" e-mails was stated as the reason why nine obscene e-mails were blocked (Davis Dep., Ex. 18; Whitlock Dep., p. 42).  Wholly unrelated to that problem, the e-mails in this case were said to have been blocked under a different provision based upon a volume concern to the end users (Davis Dep., Ex. 18; see also Davis Dep., p. 85; Whitlock Dep., p. 43).

This circumstance raises in my mind the issue of standing, even though the parties did not discuss that matter as it pertains to the facial

challenge.  Moreover, while the defendant stated at the hearing that facial challenges satisfy the standing requirement, that general, off-the-cuff statement cannot confer standing, which is a jurisdictional requirement.  <u>See</u> <u>University of South Alabama</u> v. <u>American Tobacco Co.</u>, 168 F.3d 405, 410 (11th Cir. 1999)(The jurisdiction of a court over the subject matter of a claim cannot be waived or otherwise conferred upon the court by the parties.); <u>see</u> <u>also</u> <u>Bochese</u> v. <u>Town of Ponce Inlet</u>, 405 F.3d 964, 974 (11th Cir. 2005), <u>cert</u>. <u>denied</u>, __ U.S. __, 126 S.Ct. 377 (2005) (Standing is a threshold jurisdictional question.)

The plaintiffs must demonstrate three elements in order for standing to exist.  First, the plaintiffs must have sustained an "injury in fact," meaning "an invasion of a legally protected interest." <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  This injury to a protected interest must be "concrete and particularized, ... and 'actual or imminent, [as opposed to being] conjectural or hypothetical'" <u>Id</u>. (internal citations omitted).  Second, a causal connection must exist between the plaintiffs' injury and the challenged conduct.  <u>Id</u>.  Finally, "it must be 'likely,' as

opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Id</u>. at 561.

These three requirements are essential for a court to exercise jurisdiction. <u>Camp Legal Defense Fund, Inc.</u> v. <u>City of Atlanta</u>, 451 F.3d 1257, 1269-70 (11th Cir. 2006). There are also prudential considerations that bear on the issue of standing. <u>Id</u>. at 1270. One of those is the principle that a plaintiff cannot assert the rights of third parties. <u>Id</u>. An exception to this principle is the overbreadth doctrine, under which litigants may challenge a statute or regulation not because their own rights of free expression are violated, but out of a concern that others not before the court may refrain from constitutionally protected speech. <u>Id</u>.

However, the overbreadth doctrine, which is an aspect of the prudential considerations of standing, does not obviate the plaintiffs' need to meet the constitutional core requirements of standing. <u>Id</u>. at 1271-72. Thus, even with respect to a First Amendment overbreadth challenge, plaintiffs must establish that they have suffered some injury as a result of the defendant's actions. <u>Id</u>. Moreover, an injury under one provision of a statute or regulation does not confer standing on a plaintiff to challenge all

provisions of that statute or regulation.  Id. at 1273-74.  Rather, even under

the overbreadth doctrine, the plaintiffs must demonstrate an injury in fact

from each provision they are challenging.  Id.

Consequently, in order to challenge the "unwanted" or

"unsolicited" provision, the plaintiffs must show that they have suffered, or

face a threat that they will suffer, some injury in fact from that provision.

Under Camp Legal Defense Fund, it is not enough to show that they have

suffered an injury from some other  provision.

As previously explained, the plaintiffs have not suffered any

past injury from the "unwanted" or "unsolicited" provision.  The evidence

establishes that that provision had nothing to do with the blocking of the

plaintiffs' e-mails.  The plaintiffs, who, of course, have the burden to prove

standing, have not identified any significant probative evidence showing

that it did.

Therefore, the plaintiffs, in order to have standing to challenge

the "unwanted" or "unsolicited" provision, must demonstrate a future threat

of injury from that provision.  It is not enough, however, to show that there

is a conjectural or hypothetical threat, but, rather, the plaintiffs must show

that the threat is real and immediate.  Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004).

The plaintiffs have not even alleged an immediate threat of future injury from the "unwanted" or "unsolicited" provision.  Thus, the second amended complaint does not even mention that provision (Doc. 25). Moreover, the only statement in the second amended complaint pertaining to the future is that "[p]laintiffs intend and have plans to continue attempting to petition the [d]efendant through e[-]mails this year [2006]." Id. at p. 7, ¶27.  The second amended complaint, therefore, does not even contain sufficient allegations to show standing to challenge the "unwanted" or "unsolicited" provision based upon a threat of future injury.  See Elend v. Basham, 471 F.3d 1199, 1206-09 (11th Cir. 2006).

In the proposed third amended complaint, the plaintiffs seek to remedy this deficiency by alleging that they have plans to continue sending e-mails "this year and subsequent years" (Doc. 111-2, p. 8).  That proposed amendment, however, should be rejected for the reasons previously stated. Further, the third amended complaint still seems deficient because it does

not contain any allegation that additional e-mails from the plaintiffs have been blocked.

Moreover, since this case is now at the summary judgment stage, the plaintiffs cannot rely simply upon allegations, but must come forward with evidence showing standing. The plaintiffs, however, have not addressed in their memoranda the question of standing to challenge the "unwanted" or "unsolicited" provision, so that I am unaware of the evidence the plaintiffs purport to rely upon to demonstrate such standing. Based upon my review of the evidence, it appears to me that there is none.

In the first place, the blocking incident took place on November 2, 2005. There is no indication that any similar blocking has taken place in the eighteen months since that time. Consequently, there is no reason to think that there will be any blocking in the future of the plaintiffs' e-mails pursuant to the "unwanted" or "unsolicited" provision, especially since the prior blocking of the plaintiffs' e-mails was not based upon that provision.

Moreover, the people who do the blocking are Laneau and Graber. They are computer technologists and there is no indication that they block e-mails based upon a political agenda or personal animosity (see

Graber Dep., p. 17; Laneau Dep., p. 62).  Rather, they block e-mails based upon complaints by the end users (Davis Dep., p. 198).   In this respect, Graber, to whom blocking requests are normally routed, testified that he would not have blocked something based on the message, indicating that blocking is viewed as serious (Graber Dep., pp. 17, 108).

In addition, Davis, their boss, stated that typically they would not block political speech in light of the First Amendment (Davis Dep., p. 58).   He said he assumes that the First Amendment would prohibit an individual from blocking political speech (id. at p. 49).  Consistent with that assumption, Davis is the person who ordered the block to be removed as soon as possible when he discovered overnight that the e-mails addressed the school calendar issue.

The length of time that has passed without any evidence of additional blocking of the kind that was involved in this case, and the attitude of the people charged with the responsibility of blocking make speculative at best any concern that the plaintiffs' e-mails will be blocked in the future.  After all, the decision to block the e-mails was a hurried end-of-the-day decision when the technologists were faced with a situation

involving the rapid arrival of a large volume of e-mails from a single IP address that did not match the reply-to address.   The plaintiffs have provided no reason to think that Davis and the technologists have not learned from that experience.

In all events, as Camp Legal Defense Fund teaches, in order to have standing to assert a facial challenge to the "unwanted" or "unsolicited" provision, the plaintiffs must have suffered an actual injury, or an imminent threat of injury, from that provision.[3]  As previously explained, the plaintiffs have not suffered any actual injury from the "unwanted" or "unsolicited" provision since that was not the basis upon which the plaintiffs' e-mails were blocked.   Moreover, the plaintiffs have not adduced any evidence showing that there is a real and immediate threat of blocking their e-mails, and they certainly have not made the additional showing that such a threat arises from the "unwanted" or "unsolicited" provision.   Consequently, the plaintiffs do not have standing to challenge that provision.

---

[3]Camp Legal Defense Fund provides the governing law concerning the relationship of the injury in fact requirement of standing and the overbreadth doctrine.   It is distinguishable on its facts, however, since that case involved a licensing scheme that required a prior application.   There is no prior restraint on e-mails sent to the School Board.

Furthermore, even if the plaintiffs had standing to challenge the "unwanted" or "unsolicited" provision, that challenge would fail on the merits.  The provision, as adopted by the School Board, applies internally to employees and students and does not govern e-mails sent by outsiders.  In addition, the provision does not confer unfettered discretion upon some School Board employees to block e-mails, as the plaintiffs contend, because it is the end users who decide what is unwanted or unsolicited.

As indicated, School Board liability must be based upon a policy that the School Board has adopted.   The evidence shows that the School Board adopted telecommunications guidelines that included the "unwanted" or "unsolicited" provision (Davis Dep., p. 181; Romano Dep., p. 14).  However, the guidelines were only adopted to govern employees and students (Davis Dep., pp. 206-07).

Davis explained that the district's policies and procedures govern only the district's employees and students (and potentially parents) (Davis Dep., pp. 207-09).  He drew a distinction between governance and application (id. at p. 209).  He indicated that, while the policies and procedures might be applied to outsiders, they only govern employees and

students (id. at pp. 209-10).  Davis was saying, in other words, that the School Board had adopted a telecommunications policy for employees and students, but that he and his staff might look to those guidelines when dealing with problems involving e-mails coming in from the outside.

Several circumstances confirm that, when the School Board was adopting the telecommunication procedures, it was only intending to adopt a policy that would govern employees and students.  In the first place, there is nothing on the face of the procedures that would indicate to the School Board members that they were adopting procedures that would govern telecommunications from outsiders (see Davis Dep., Ex. 23). Rather, the procedures appear to deal with matters within the school system.

That is particularly true with respect to the provision that is being challenged: "Harassment or unsafe, unwanted, or unsolicited contact via district-sponsored telecommunications services and networks is prohibited in accordance with board policy."  This provision, which makes no mention of blocking e-mails, is simply complementary to other provisions of board policy.  Davis believed that the reference to board policy meant the School Board's harassment policy (id. at p. 182).  There

is no evidence that the Board was adopting an e-mail policy or procedure to protect its e-mail system from outsiders.

In all events, the prohibition against unsolicited contact unquestionably demonstrates that the "unwanted" or "unsolicited" provision applies only internally.  If it applied to outsiders, it would directly contradict the welcome the School Board has extended on its web site to outsiders to communicate by e-mail.  The School Board certainly would not have adopted such inconsistent practices.[4]

The conclusion that the "unwanted" or "unsolicited" provision did not authorize the blocking of e-mails from outsiders is also corroborated by board member Faliero's unequivocal statement: "We don't have a policy that blocks e-mails ..." (Faliero Dep., pp. 11-12).  There was no evidence from a board member to the contrary.

The evidence, therefore, establishes beyond reasonable dispute that the telecommunications procedure in general and the "unwanted" or

---

[4]Notably, if the School Board did adopt a policy of prohibiting unsolicited e-mails, that would seemingly defeat the plaintiffs' contention that the School Board had created a public forum.

"unsolicited" provision in particular were adopted by the School Board only to govern internal communications. Moreover, if there were some ambiguity about this interpretation, the provision should be construed in a manner which avoids the constitutional problem. <u>Gonzales</u> v. <u>Carhart</u>, ___ U.S. ___, 127 S.Ct. 1610, 1631 (2007); <u>Southlake Property Associates, Ltd.</u> v. <u>City of Morrow, Georgia</u>, 112 F.3d 1114, 1119 (11th Cir. 1997), <u>cert</u>. <u>denied</u>, 525 U.S. 820 (1998). Certainly, pursuant to that basic principle, the "unwanted" or "unsolicited" provision adopted by the School Board is appropriately construed to govern only its internal telecommunications. Under that construction, the plaintiffs have no basis for claiming that the provision violates their First Amendment rights.

There is, furthermore, an additional reason why the facial challenge to the "unwanted" or "unsolicited" provision fails: The evidence does not sustain the plaintiffs' contention that the provision unconstitutionally confers unfettered discretion to block unwanted messages. Thus, the evidence establishes that the determination of whether

a communication is unwanted or unsolicited is made by the end user, that is, the recipient of the e-mails (Davis Dep., p. 198; Romano Dep., p. 66).

As indicated, the steps to block an e-mail are carried out primarily by Graber, but apparently could also be performed by Laneau. There is no evidence that these two men are sitting at some monitor screening e-mails as they come in.   Rather, they simply respond to complaints by end users.

Laneau explained that the School Board's e-mail filter will "tag" the subject line as profanity or spam based on criteria that the software has established (Laneau Dep., p. 79).  The men do not delete the tagged e-mails, but forward them to the recipients (id.).  It is the end user's choice in deciding how to respond to the tag (id.).  This implementation of the "unwanted" or "unsolicited" provision confirms that the School Board did not adopt a procedure that gives Graber or Laneau (or anybody else) unfettered discretion to block e-mails.  See Southlake Property Associates, Ltd. v. City of Morrow, Georgia, supra, 112 F.3d at 1119.   And, as indicated, that is unequivocally what board member Faliero stated.

-43-

The evidence, therefore, establishes that the "unwanted" or "unsolicited" provision merely sets forth a procedure whereby the end user can determine that an e-mail is "unwanted" or "unsolicited." Moreover, as previously indicated, if there is any uncertainty about that interpretation, the provision should be construed in that way in order to avoid the constitutional issue. Gonzales v. Carhart, supra, 127 S.Ct. at 1631; see Southlake Property Associates, Ltd. v. City of Morrow, Georgia, supra.

Plainly, a procedure that permits the end user to decide whether to receive an e-mail does not create a constitutional problem. Rowan v. United States Post Office Department, 397 U.S. 728 (1970); see also Hill v. Colorado, 530 U.S. 703, 716-18 (2000). Significantly, the plaintiffs do not argue that it does (see Doc. 80, p. 20). Accordingly, as properly interpreted, the "unwanted" or "unsolicited" provision is not unconstitutional on the ground that it affords unfettered discretion to the School Board to block e-mails.

In sum, the "unwanted" or "unsolicited" provision is constitutionally valid. It does not establish a procedure that governs e-mails

being sent by outsiders.  Furthermore, the choice of whether to receive e-mails resides with the end users.

The plaintiffs' free speech claims therefore fail under each theory that the plaintiffs have asserted.  For the same reasons, the plaintiffs' claim in Count II regarding the right to petition the government also lacks merit.

As the defendant points out, while the right to petition and the right to free speech are separate guarantees, they are generally subject to the same constitutional analysis.  Wayte v. United States, 470 U.S. 598, 611 n. 11 (1985).  Accordingly, the plaintiffs in their response to the defendant's summary judgment motion did not purport to develop on the right-to-petition claim any argument meaningfully different from their argument on the free speech claim (Doc. 97, pp. 13-14).  Moreover, the plaintiffs do not even argue the right-to-petition claim in their own motion for summary judgment.  Consequently, the right-to-petition claim falls along with the free speech claim.[5]

---

[5]It is noted that, if there had been a right-to-petition violation, it would be a trivial one.  A further vote on the school calendar issue took place subsequent to the unblocking

The second amended complaint also has a Count III, which requests declaratory relief.  In light of the conclusion that the plaintiffs' claims lack merit, that count similarly does not support relief.

IV.

For the foregoing reasons, I recommend that the plaintiffs' motion for summary judgment (Doc 80) be denied.  I recommend further that the defendant's motion for summary judgment (Doc. 70) be granted, and that the case be dismissed.   Correspondingly, I recommend that the Plaintiffs' Motion to Amend Complaint (Doc. 111) be denied.

Respectfully submitted,

DATED: MAY 11, 2007

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

---

of the IP address.  Moreover, that address was blocked for little more than one business day, and the purported petitioners were quickly informed that they could e-mail the School Board during that period through other channels.

-46-

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).